Brian K. Jackson (15296)
Brian K. Jackson, LLC
341 S. Main St. Suite 500
Salt Lake City, Utah 84111
Phone: (801) 441-8922
Fax: (801) 534-1948
brianj@bjacksonlaw.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTAL DIVISION

| | |
|---|---|
| Diana True;<br>Cori Berhends;<br>Stephanie Andrews;<br>Virginia Mathios;<br>Michele Noren;<br>    Plaintiffs.<br><br>v.<br><br>Delta Airlines, INC.<br>    Defendants, | **COMPLAINT**<br><br>Civil No.:<br><br>***JURY TRIAL REQUESTED*** |

Plaintiffs, through counsel of record, now brings this action for injunctive and monetary relief in Federal District Court against Defendant, Delta Airlines, INC for damages in tort and arising under the American with Disabilities act of 1990 and related provisions:

### PARTIES, JURISDICTION, VENUE

1.      Diana True, Plaintiff,  was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah.

2.      Michele Noren, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah.

3.      Cori Berhends, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah.

4.      Stephanie Andrews, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah

5.      Delta is the employer of the Plaintiffs in this complaint and its principal headquarters are located in Atlanta, Georgia and employs over 500 employees.

6.      Subject Matter Jurisdiction and venue is proper as these matters relates to issues that arise out of federal law under the Americans with Disabilities Act of 1990 and the incidents alleged in this complaint occurred from residents of Salt Lake County and its supervisors and managers and "base" of the company that is located in Salt Lake County, Utah.

## LEGAL ALLEGATIONS

**1. Violation of the Americans with Disabilities Act of 1990.**

**a.  Discrimination, harassment, failure to accomodate, retaliation based on disability.**

7.      At the end of May of 2018, Delta issued new "passport" plum uniforms for its flight attendants use as well as other employees that worked in various capacities at the airport. The uniforms contain harmful and toxic heavy metal and chemical compounds noted further in this complaint. The purple uniforms included, pants, purple sweaters, dresses, aprons, blouses, skirts and leggings among other articles of clothing. The uniforms were produced by the company Lands End.

8.      In June of 2018, Delta flight attendants, including those named in this complaint, started experience issues with the new uniforms. This included rashes, hives, respiratory issues, kidney issues, loss of hair, coughing, runny noses, brain fog, swollen lymph nodes, metallic taste in their

mouths, headaches, bloody urine, clogged ears, slurred speech as well as anxiety and depression related to use of the uniforms. Many flight attendants were diagnosed with vocal chord dysfunction as well as asthma. They had to attend speech therapy to help resolve their deep and or horse raspy voice. They also were prescribed inhalers.

9.      Reports were made of individuals that experienced issues to Delta at the onset on when the uniforms were issued. The media caught hold of the issues in June of 2018. Delta claimed it was just a few individuals experiencing problems which were resolved in switching out the aprons. Individuals prior to the issuance of the uniforms that were "testers" also reported health concerns and Delta still did not warn its employees of possible adverse health effects of the uniforms. Delta continued to deny the adverse health affects of the uniforms all the way until on or about November of 2019. Delta never issued a full re-call on behalf of its employees with the uniform. Delta finally indicated on or about November of 2019 that they would change the uniforms.

10.     Numerous individuals complained about the uniforms and the severe health affects and acted as witnesses on behalf of the government investigations including Ms. Noren, Ms. True, Ms. Mathios, Ms. Andrews and Ms. Berhends. In response, Delta would respond with the claim that they did numerous allergy tests on the uniforms and there were no issues with the uniforms and any individual that was suffering from the uniforms was less than 1% of all employees.

11.     There are over 64,000 employees that use the uniforms. A main Facebook page was created to help awareness for all employees that were having health issues with the uniforms as well as a few other Facebook pages. There are were 3,700 members on the main Facebook page at as of June of 2019 time with flight attendants that have suffered from the ill health effects. As

of February of 2020, there are over 6,650 members on the Facebook page. The Facebook page

was created in December of 2018 by Ms. True to help other flight attendants become aware that

their adverse health effects were from the uniform and within 30 days there were 600 members.

12.     If employees experienced health problems with the uniforms, they were to contact Delta

and report the injury. All of the Plaintiffs reported the injury and sent in a doctors note from their

doctors that indicated that their health problems were related to the purple uniforms with requests

that the employees be allowed to wear alternative black and white uniforms they could purchase

at a retail outlet store. Ms. Andrews and Ms. Berhends learned the adverse health effects they

they suffered from were from the uniforms as a result of the Facebook page in the early part of

2019 and from Ms. True.

13.     Ms. Noren was originally approved for the alternate uniform in the Fall of 2018 as well

as received workers compensation benefits. Ms. Noren no longer suffered from the ill-effects

while she was in the alternate uniform. Ms. True received benefits but was not approved for

black and white. Ms. True was bed-ridden on or about October of 2018 for over a week as a

result of exposure to the uniform. After Ms. True recovered from exposure, Delta would not give

Ms. True approval to work in the alternate black and white uniform to allow her to return to

work.

14.     In the Fall of 2018, Delta started to subject its employees who reported a work-site injury

to allergy tests. The test was conducted by Delta with their own samples and requirements on

when to report the results which was approximately 48 hours after contact with the skin. Part of

the sample included part of the uniform. Ms. True requested Delta not to force her to take the test

with concerns it would make her sicker. Her request was denied. She made the request three

times. Twice to her base manager and to another supervisor. Ms. True was told she had to do the

patch test. Sedgwick claims management an agent of Delta, said that if Ms. True didn't take the

patch test she couldn't go back to work. Ms. True told them she already knew she was allergic

which was Nickel.

15.     In March of 2019, the Delta uniform team did a reverse and said that all individuals were

expected to wear the purple uniform and started to deny individuals their prior-approved workers

compensation benefits. Later, Delta started to deny workers compensation claims with the claim

that individuals "were already allergic to something and therefore, it could not be the uniform"

despite the fact that individuals had tested positive for the uniforms in the skin tests.

16.     All individuals were denied workers compensation with the claim from Delta that it was

not the uniform and therefore not a work-site injury. Despite this, employee's doctors would not

allow them to return to work in the purple. Employees were stuck in a catch-22. The medical

examiners of Delta would not see the individuals personally and only review the medical

records. The medical examiners would deny claims even if individuals tested positive for the

uniform in the allergy tests.

17.     Ms. Andrews was originally approved and compensated and then was denied. The denial

of black and white forced Ms. Noren to have to wear the uniform again and suffer from

additional exposure. Ms. Noren, on or about March of 2019 was in the process of taking her

clothes from the her laundry and had an attack from exposure to the uniform. Ms. Noren

contacted a Sedgwick nurse and she was told to report to the Emergency Room.

        **New black and white approval**

18.     Delta setup a process for the uniforms for alternate approval where if an suffered from severe health effects from the uniform they would be sent alternative purple uniforms. Delta indicated, "You are expected to try-on all available options that would reasonably meet your needs." Employees under Delta policy first had to try the pants suit wool or non-wool. If that didn't work, they had to then try the signature dress. If that didn't work, they then had to try the v-neck dress. If that didn't work they had to try the twin cardigan set. If those didn't work under the policy, then Delta would work with Lands End "to create alternate material options." This included the 100% cotton blouse/shirt. If that didn't work, the company would "add inside lining to garments." If that didn't work, then the individual had to try an "un-treated non performance blouse /shirt." All of the alternate uniforms were still dyed in the passport plum.

19.     All of the alternative options still included the passport plum purple. The purple dye would bleed on individuals' clothing and stain their undergarments as well as other clothes. It would also stain airplane seats. Individuals started to experience the symptoms the worse when they started to sweat, making the dye airborne and enter into the bloodstream and respiratory system. Ms. True experienced a hoarse throat and had trouble speaking immediately when she opened an alternative option. The alternative choices were non-specific or without reason as to the basis on how it would cure the symptoms each flight attendant faced.

20.     At the end of that process there is a hand that says "stop." The policy notes, "Flight Attendants who have exhausted all options are moved to accomodations process for additional handling. Once received by accomodations, FAs should provide medical documentation indicating their needs; the accommodations team will work with FA and Lands' End to determine if a uniform alternative maybe possible. Alternatively, if no uniform accomodation is

available we will work with FAs to assist with finding a suitable non-uniform positions with Delta." Any position offered was not the same rate of pay as a flight attendant.

21.     If individuals still suffered severe adverse effects from the uniforms, the company would, "on a case-by-case determination" allow employees to "temporarily wear approved personal black and white suit pieces for up to 60 days." This is what is known as "black and white" where individuals were given a stipend to purchase black-and-white dress uniforms instead of wearing the issued "passport plum" purple uniforms.

22.     Individuals were issued a 60-day approval form that they had to carry with them. The form noted, "Please be advised that Delta and Lands' End are currently working to manufacture a non-wool option that is completely untreated and that you will be required to try that option when it's made available. The noted indicated, "This exception is for a temporary period of no more than 60 days from the date of this letter and for those specific items as indicated in this form. The IFS Uniforms Team reserves the right to review this grant at any time and modify the end date as appropropriate." The approval was signed by the director and manager of the company's uniform team.

23.     Since Delta would claim that it was not a work-site injury they claimed they could not wear black and white, despite a doctor's claim to the alternative. Or, Delta would claim that it was not the uniform but allow still allow employees to still wear the alternative uniform. There was no set basis on how an individual was approved for black-and-white and was instead an arbitrary decision. Also, given the long process to even get approval, many individuals have had to wait long-periods of time while either missing work or being forced to wear the purple uniforms as they jump through all of Delta's "hoops" to obtain black and white approval. A pilot

on a flight with a flight attendant saw how bad the flight attendant was suffering from the

uniform and told her to change her clothes. The pilot filed a report to Delta and that person was

immediately approved for black-and-white the following day.

24.     When individuals were unable to return to work despite doctor's notes including Ms.

True, Ms. Mathios, Ms. Noren and Ms. Berhends, they would contact the job accommodation

team. The uniform team did not transfer the claims to the job accommodations team as they

claimed. The accommodation team required a full release of medical information in addition to a

physician's form for job accommodation. This was after employees had already filled out forms

and medical releases for FMLA leave, short-term disability leave and workers compensation.

Delta also would require some individuals to be subject to medical examination experts for these

requests. This is not included in Delta's policy handbook. All it required was a doctor's

certification.

25.     There were also many individuals that Delta would not allow to return to work even

though they were denied workers compensation and black and white approval because Delta was

"concerned about their health" if they returned to work. This was the case of Ms. True and Ms.

Noren. This contradicted Delta's own claims that it was not a work-site injury. Or, individuals

would be approved for black-and-white but Delta would not allow them to return to work and

pull them from the schedule. This happened to Ms. True. Ms. True was originally scheduled to

return to work on or about June of 2019. Later, she received a call that she was pulled from the

schedule. Ms. True maintains that the actions against her was invidious disparate treatment as a

result of her suffering from a work-site injury that made it so Ms. True was unable to work. This

was without medical documents to show they were so unhealthy to return to work and again and contrary to doctor's notes that they could work if they did not wear the purple uniforms.

26.     Thereafter, Ms. True was subjected to psychological evaluations that Delta wanted Ms. True to have to do in order for her to return to work. They wanted her to do one in Ohio. They also wanted her to see a pulmonologist. The requests for these tests were not made until July of 2019. Delta didn't schedule appointments until September and August and Ms. True was unable to return to work until those tests. After the examinations were conducted, Ms. True was still unable to return to work. Ms. True around this time, showed-up for a test / class she needed to be done as a flight attendant that Delta told her she had to attend. When Ms True showed-up and was there for two hours she was escorted out of the class and was told that she could not be there. There were two classes prior that were cancelled by Delta prior.

27.     Ms. True maintains that the actions against her were discriminatory from suffering from her adverse health effect. Ms. True was treated differently than other individuals that suffered from the same adverse health effects. Other individuals were approved without problem for black and white and were not subject to the same scrutiny as her. This is also true for Ms. Behrends and Ms. Mathios and Ms. Noren. The process and procedure was discriminatory, arbitrary and without medical explanation or individual basis as to use of the alternate uniforms.

**28.     Retaliation based on disability.**

29.     All Plaintiffs also maintains that the actions against them were retaliatory for their reports of a severe health effects to their supervisors, of their complaints to their supervisors and to other personnel related. They also maintain the actions were retaliatory for reporting the issues and or testifying as a witness during an investigation to the division of Utah Occupational and Safety

Heath that were made in the early part of 2019. They also maintain that the adverse actions against them were as a result of the creation of the Facebook page to allow individuals collaborate and share stories as to the adverse health affects of the uniforms.

30.     Delta also implemented policies and procedures that were retaliatory and a quid pro quo to keep Delta employees reporting to the public of adverse health effects from the uniforms. The private Facebook page was created and strict rules were provided as Delta had policies that deterred and punished individuals that made social media or public posts that were adverse to the company. All employees, including these employees, were scared of reprisals from the company if they reported these adverse health effects to the media and to their friends and family members publicly on social media.

31.     Finally, on or about November of 2019 Delta did a reversal where they indicated that Delta employees could wear black and white uniforms indefinitely but were expected to wear alternate uniforms when they became available.

32.     Ms. True was not approved for black and white and could not return to work until September of 2019, almost a whole year after she had first taken time off work from the uniform. Ms. Noren was not re-approved for black and white and could return to work until on or about October of 2019.

**33.     Discrimination, harassment and failure to accomodate based on a disability.**

34.     These actions were also a failure to accommodate each Plaintiff based on their health conditions with their inability to perform their job without proper accommodations based on a known disease determined by their physicians. Their physicians requested that the individuals wear the black and white uniforms and their physicians indicated they could return to work with

such accommodations. Despite this, Plaintiffs were subject to discriminatory practices and policies implemented by Delta through the uniform approval process.

35.     Despite the doctors notes, Delta would still subject employees to additional purple uniforms that still caused ill health effects. The plaintiffs maintain that this was also unlawful harassment based on their health condition. Other employees were not subject to this same process and were approved immediately for black and white. The approval was also only for 60 days. Thereafter, it had to be approved by the company for a renewal. Without the approval, these employees could not return to work such as Ms. True, Ms. Behrends and Ms. Noren. Ms. Behrends was approved for the black and white and but still raised concerns of still getting sick. Delta called Ms. Behrends on the way to work and said that she could not return to work. This happened on or about May 9th, 2018. Ms. Behrends has been unable to return to work and forced her into a long-term medical leave of absence but her long-term disability was denied.

36.     Also without the approval, the individuals were forced to wear the purple uniform which included Ms. Noren and Ms. Mathios despite the doctors notes that were sent to their employees. The request was reasonable as it only related to a different wear in employee uniform. However, Delta pushbacked only due to branding and marketing of the company which came from Delta's uniform team and the approval process came from the Delta uniform team, not from Human Resources or from supervisors.

> "Having a subgroup of employees wearing black-and-white personal attire and having another group of employees wearing the uniforms just isn't acceptable," Ekrem Dimbiloglu, director of uniforms at Delta, told The Atlanta Journal-Constitution. he told the newspaper, noting that thousands wear alternate uniforms. "It's just too many," he said. "We've got to be a unified force."

37.    Branding and marketing is not a reasonable basis to subject employees to additional

adverse health effects with additional exposure to harmful substances from the uniform or keep

employees from their ability to return to work and provide for themselves and also causes the

harassment to be severe and pervasive.

38.    Also, in this instant case with the company-wide health effects that employees suffered

from, a full recall of the uniforms and use of the old uniforms would have be reasonable in light

fo the circumstances to ensure that employees, pilots, and paying customers did not suffer from

the adverse health effects of the uniform.

39.    The failure on part of Delta shows their disregard for the health of their employees and

the public as a whole and instead with the focus of their public image and how severe and

pervasive the harassment was. Delta also should-have warned its employees of the possible

health effects of the uniforms at the onset and from the testers. The failure to do so was also

discriminatory to Plaintiffs and their adverse health effects. This was also a failure to

accommodate its Delta employees and help them identify possible sources of their adverse health

effects. Instead, Delta denied the claims that they were related to the uniforms with

communication to its employees and to government investigators for over 16 months.

40.    Ms. Mathios sent in a doctors note with a request for her to be in the alternate uniform.

Ms. Mathios suffered from severe health effects related to the uniform and her symptomology

was one of the worst out of the other Plaintiffs. Delta would not approve Ms. Mathios for

black-and-white uniforms. Given no other option to provide for herself, Ms. Mathios was forced

to continue to wear the purple uniforms. Ms. Mathios would continuously e-mail Delta

supervisors and responsible personnel as to her health condition and request for black and white

approval. This was a specific failure to accommodate Ms. Mathios ans her doctors request for an alternate uniform and was discriminatory toward Ms. Mathios and the ill health effects she suffered from the uniform.

41.     In response to Occupational Health complaints, Delta would claim that only 50 employees were approved in the black and white to make it look as if only a handful of individuals were actually suffering from severe side-effects. Delta did not disclose how many employees had requested black and white approval that were denied despite specific doctor's request for them to be in alternate black and white uniforms.

42.     Many employee's personal doctors conducted an "off-gas" test where employees would be exposed to the uniform for 45 - 60 minutes. The lung capacity was measured before and after exposure. Employee's lung capacities would diminish 10 - 20% after exposure to the uniform. Despite these tests, Delta would still claim that it was not a work-site injury. This included Ms. True, Ms. Andrews and Ms. Berhends.

43.     Females experienced symptoms worse than males and if a male complained of issues with the uniform, they would not have to go through the same rigorous procedures and approval as their female counterparts.

44.     **OSHA response and alternate work**

45.     On June 26th, 2019 the Department of Health and Human Services issued a report to the health effects of the uniforms from complaints made by Ms. True and Ms. Mathios. The department concluded, "It is possible that textile chemicals in the uniforms or the physical irritant properties of the uniform fabrics have caused skim symptoms among Delta employees.

46.     The Department recommended the following: "Allow employees to use alternative uniforms on a long-term basis, if symptoms resolve with this alternative." "Allow employees to

wear alternatives when their uniforms are being lined." "Continue to encourage employees to report potential work-related health condition to their supervisor." "Healthcare providers may recommend interventions such as the need for removal from exposure of employees with work-related health problems.

47.    If employees are moved to different locations or job duties to work-related health concerns they should retain pay and benefits associated with the original job duties." Delta did not change its pattern with employees when this was issued. Individuals still had to go through their own process for approval despite a doctors note.

48.    Individuals were not offered alternative positions, and if they were, they had to apply for the position at a lower amount of pay, this is what happened to Ms. Behrends as the company claimed that she was too sick to be able to return to work. However, they still denied her short-term disability and long-term disability benefits through their agent Sedgwick. Delta ultimately terminated Ms. Behrends after her long-term disability was denied and marked her absences as excessive absences as the basis for the termination. *(See attached Exhibit C)*

49.    As to alternate position accommodations, the positions are not the same rate of pay of the prior position and Delta only offered assistance. There were no positions that Delta offered. Individuals were required to apply for any open position that was made available under the same description and pay amount of the description.

50.    In order to access the specific Human Resources inflight policy manual, an individual must request permission to access the resource. Under the policy, Delta offers, "Transitional Duty for takes up to 90 calendar days for employees recuperating from an injury or illness

released to return to work with temporary medical restrictions." This was not offered to the flight attendants that suffered from the affects of the uniforms.

51.     Some flight attendants were also subject to additional medical tests to determine whether or not they could return to work while others did not have to go through the same tests.

52.     The harassment was also ongoing harassment since the the individuals originally complained of adverse health effects to these uniforms.

**Delta tests**

53.     In the Fall of 2019, Delta claimed to have conducted its own tests on the uniforms with the claim that there was nothing in the uniforms that would case the adverse health effects its flight attendants suffered. However, many of the "tests" were tests that had already been performed by Lands End. It was not Deltas own individual test and they only relied on those test. Many of Lands End test results that were produced to government occupational exposure agencies also are garments from the old Delta uniforms and not the new passport plum uniforms to claim there was nothing wrong with them.

54.     In its Uniform Testing Comparison Report ("Testing Report"), Delta pledged: "[S]afety is our top priority and since we began redesigning the uniform three years ago, our top focus has been ensuring that every employee can safely wear these new garments." Delta further stated that it and "Lands' End have taken detailed steps to ensure that the garments undergo significant testing that meets or exceeds appropriate industry standards…". The Testing Report then sets forth the applicable standards, claiming that the garments meet these standards.

        **Independant garment tests**

55.     The "extractable heavy metal limits established by the Report expressed in mg/kg
include:

Chromium - 2.0, Mercury - .02, and Antimony - 30.0. The "allowed limit per garment"
established for Formaldehyde expressed in the ppm is 75. The Testing Report also claims to have
screened for "Volatile Organic Compounds." No reference is made to which Compounds were
screened, but the Report established limits at 10 mg/kg. For such Compounds, the Report also
claimed no detectable amounts.

56.     Counsel for Plaintiffs have began testing numerous different Uniforms at three different

57.     independent labs. These tests have revealed harmful, toxic levels that are literally off the
charts, as high as 130 times established limits. To date, we have found different garments with
the following staggeringly high levels expressed in mg/kg (Each number representing a separate

58.     garment):

59.     Antimony - 51.8, 52.3, 53.1, 61.5, 64.4, 67, 67, 70, 72.3, 74.5, 74.6, 76.4, 77, 77.3, 78.5,
79.3, 79.5, 83.1, 83.6, 94, 103, and 147.

60.     Chromium -12.3, 24, 34.6, 35.6, 36, 52.4, 54.3, 59.7, 62.8, 68.8, 69, 75.2, 75.7, 77.3,
78.7, 80,

61.     84.2, 86.8, 89.3, 89.8, 92, 98.3, 101, 127, 130, 231, and 263.

62.     Mercury - .0247, .059, and .082.

63.     Bromine - 54, 90, 112, 160, 217, and 433.

64.     Fluorine - 61, 64, 79, 89, 297, 725, 807, 862, 865, 886, and 1,068

65.     Testing each garments for Formaldehyde also revealed staggeringly high levels using
Released

66.     (Vapor Absorption) Methods after 3 and 20 hours: 3 hours

67.     75, 107, 148, 281, and 764 20 hours 115 and 254.

68.     According to the Center for Disease Control, these metals and chemicals include the

following known adverse health consequences:

69.     (a) Chromium: It is harmful to the skin, eyes, blood, and respiratory system. (b)

Antimony: It is harmful to the eyes, skin and cause hair loss. It is used to make

flame-proofing materials.

70.     (c) Mercury: High mercury vapor concentrations can quickly cause severe lung

damage. At low vapor concentrations over a long time, neurological disturbances, memory

problems, skin rash, and kidney abnormalities may occur. Mercury can pass from a mother to her

baby through the placenta during pregnancy and through breast milk after birth.

71.     (d) Formaldehyde: Exposure to formaldehyde can irritate the skin, throat, lungs, and

eyes. Repeated exposure to formaldehyde can lead to cancer.

72.     (e) Fluorine: Exposure to Fluorine can irritate the eyes and harm the

kidneys, teeth, bones, nerves and muscles. It is used as a stain repellant.

73.

74.     (f) Bromine: Used as fire retardant. Bromine works by directly irritating the skin,

mucous membranes, and tissues.

kidneys, teeth, bones, nerves and muscles. It is used as a stain repellant.

75.     Finally, despite Delta's claim and maintained the issue was not the uniform Delta gave

the following statement to its employees, "At Delta, our people are the foundation for our

success. It starts with our commitment to listen and is fueled by a spirit of continuous

improvement. Our uniform program was built on these principles and always will be. During the

last few months, we've taken many steps to alleviate some of the frustration and challenges some

of you have experienced with the uniforms. We've created alternative garments, hired experts,

tested for over 400 chemicals, incorporating OEKO-TEX's published chemical list and testing

limits, given you the option of wearing black and white, and provided access to the best doctors

in the country."

76.    "Despite these efforts, we have not been able to resolve this situation for everyone, which

has been our top priority all along. That's why we are announcing a completely new uniform

program for flight attendants and ACS above-wing employees, along with updates to our existing

uniform in the interim. We will work together to get you in these new uniforms as soon as

possible, hopefully in late 2021, depending on the feedback and guidance we receive from you."

77.    As a result, Delta, failed to reasonably accommodate its employees for its failure to

properly conduct its own independent tests in a timely fashion and in a reasonable and prudent

and proper manner. Delta failed to conduct test results before it denied liability and causation

toward Plaintiffs and before it denied liability toward government agencies and to the media.

Without this knowledge and without proper, neutral testing, Delta could not claim that the issue

was not the uniforms. The admission here from Delta indicates they did not reasonably

accommodate its employees and that they knew the severe health issues individuals suffered

from were as a result of the uniform.

78.    Each individual suffered from additional adverse health effects due to additional

unnecessary exposure to the uniform and emotional distress as it related to dealing with the

health effects from the uniform, as well as with Delta and the financial impact it caused them.

Each individual had to deal with the emotional distress and adverse health effects in the past and will have to deal with its future impact as well. Each individual suffered from loss of enjoyment of life as it dealt with dealing with Delta and their health problems. Each individual had to take time off work and suffered from loss wages and benefits. Each individual has incurred health costs and expenses. Each individual has also suffered consequential effects such as out of pocket expenses for health care costs, borrowed money from relatives, lost savings, incurred credit card interest, credit scores as well as lost Delta benefits including vacation leave, skybucks, profit sharing. Each individual also seeks reimbursement of attorney fees and costs as a result of the violations described related to violations of the Americans with Disabilities Act.

79.     Plaintiffs also maintain that the actions here were intentional as described in the complaint with ulterior motives to down-play the effects of the uniforms, to promote their brand over employment safety,

**2. Intentional Infliction of Emotional Distress**

80.     Delta through its employees and agents acting within their scope of employment with their duties at least in part to confer a benefit on Delta or acting with actual or apparent authority described in the discrimination section of this complaint intended to inflict emotional distress on each Plaintiff named in this action. Delta was aware that each Plaintiff suffered or complained of severe side-effects, including respiratory problems from use of the passport plum uniforms. Each Plaintiff complained to Delta of the side-effects, filed for workers compensation claims and short-term and long-term disability claims and Family Medical Leave claims and requested accommodations to use of the black and whtie uniform instead of the purple plum uniform.

81.     Delta was aware of its employees as a whole that were suffering from adverse health effects from the uniforms prior to when the uniforms were issued with its testers and when the uniforms were initially issued. Despite this, Delta failed to inform its employees of possible side-effects they could be suffering from its uniforms and reasonable options on how to avoid the side effects for over 16 months.

82.     Delta had knowledge of the health effects complaints of each Plaintiff, and each flight attendant's inability to work without black and white approval or to suffer adverse health effects with working without approval. All Plaintiffs complained through numerous e-mails to Human Resources, the uniform team and other personnel of their treatment and requests for accommodation and return to work or to work without the purple.

83.     Plaintiffs complained through a demand letter to Delta corporate through retained counsel and to thereafter locally retained counsel with requests as to why individuals were not returned work and or not approved for black and white. No responses were made and no timely accomodations were made. Given the knowledge of the requests the denials and delays and without any justifiable explanation, Delta intended to cause emotional distress on each Plaintiff. This is also as it relates to the retaliation claims and the complaints that these individuals made toward Delta and the different treatment that other employees received from Delta that were more favorable.

84.     Each Plaintiff either had to suffer wearing the purple, in the case of Ms. Noren and Ms. Mathios without approval. Each Plaintiff had to suffer wearing the purple without knowledge of its severe health effects for months or almost a year. Those that could not return to work absent approval suffered severe emotional distress in their inability to return to work provide for

themselves and for the frustration toward Delta and their inability to work with and properly and timely accommodate each of them.

85.     This includes anxiety, stress, depression, frustration, feelings of hopelessness and helplessness, crying, anger and suicidal thoughts. Each individual has also suffered from loss of enjoyment of life in day-to-day activities and other leisure activities. They have also suffered from consequential damages including credit scores, out of pocket expenses for medical, lost savings, borrowing money from friends and family, interest on unpaid medical bills.

86.     The actions were outside the bounds of decency given the claims as to discrimination and failure to accomodate in the disability section. This is given Delta's knowledge of adverse health effects of its own employees and its failure to help them properly resolve the issues which only they had the power to do so. This is also in light of the length of time Delta went through denying these claims. This is also in light of the adverse health effects that customers and pilots also may have suffered from exposure to these uniforms.

87.     Plaintiffs also seek punitive measures against Delta given their wilful and wanton disregard for the health, life and safety of its employees including these Plaintiffs to deter Delta from acting in the same in the future and to punish Delta for their intentional actions described in this complaint.

**3. Assault and Battery**

88.     As indicated in the intentional infliction of emotional distress claim, Delta had knowledge of the ill adverse health effects of the uniforms prior to their issuance. Delta also had knowledge of the complaints of its employees after its issuance to them and their reports of

adverse health effects, including doctor notes. Delta had knowledge of the ill effects that each individual employee in this complaint was suffering from as a result of the uniform.

89.     Given this knowledge, Delta through its agents in the failure to approve alternative garments and forced Plaintiffs to work in the uniforms after notice to the company of the adverse health effects. Delta also failed to provide notice of possible adverse health effects. This shows that Delta intentionally or in reckless disregard wanted to cause harm to Plaintiffs with use of the uniform in the name to preserve the company image and brand and to deny liability of the uniform health effects to ensure that the public at-large did not become aware of the issues.

90.     Delta sacrificed the health of its employees to control its Public Relations and to curtail negative nation-wide publicity. Each Plaintiff has now paid the price with severe health effects that have made it so Ms. Berhends can no longer work for Delta as a flight attendant. Each Plaintiff had to suffer the pain from the contact and exposure to the uniform and the after effects. Each individual also, even though approved for alternate garments, also suffer and suffered from proximity to other individuals that wore the purple uniform.

91.     It is unknown at this time how it will affect these clients in the long-term. Each Plaintiff has now suffered emotional trauma as noted in the intentional infliction of emotional distress claim and incorporated here. Each Plaintiff suffered from lost wages and benefits past and future. Each Plaintiff suffered from medical expenses and costs as well as consequential losses from their inability to work or return to work.

92.     Plaintiffs also seek punitive measures against Delta given their wilful and wanton disregard for the health, life and safety of its employees including these Plaintiffs to deter Delta

from acting in the same in the future and to punish Delta for their intentional actions described in this complaint.

**Wherefore, Plaintiffs seeks the following relief in this matter:**

1. For a jury trial to be set to determine liability on each claim alleged.

2. For damages pleaded in these causes based upon a finding of liability for each claim.

3  For all other relief pleaded in this complaint as well as any other relief the court may deem necessary.

Submitted this 23rd day of March, 2020

/s/ Brian K. Jackson          #15296
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Plaintiffs