Brian K. Jackson (15296)
Brian K. Jackson, LLC
341 S. Main St. Suite 500
Salt Lake City, Utah 84111
Phone: (801) 441-8922
Fax: (801) 534-1948
brianj@bjacksonlaw.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Diana True;<br>Cori Berhends;<br>Virginia Mathios;<br>Michele Noren;<br>    Plaintiffs.<br><br>v.<br><br>Delta Airlines, INC.<br>    Defendants, | **AMENDED COMPLAINT**<br><br>Civil No.: 2:20-cv-00191-HCN-DBP<br><br>The Honorable Judge Howard C. Nielsen, Jr.<br><br>***JURY TRIAL REQUESTED*** |

Plaintiffs, through counsel of record, now brings this action for injunctive and monetary relief in Federal District Court against Defendant, Delta Airlines, INC for damages in tort and arising under the American with Disabilities act of 1990 and related provisions:

### PARTIES, JURISDICTION, VENUE

1.      Diana True, Plaintiff,  was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah.

2.      Michele Noren, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and is a resident of Salt Lake County, Utah.

3.      Cori Berhends, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and was a resident of Davis County, Utah.

4.     Virginia Mathios, Plaintiffs, ori Berhends, Plaintiff, was a flight attendant of Delta Airlines at the time the alleged incidents below occurred and was a resident of Salt Lake County, Utah.

5.     Delta is the employer of the Plaintiffs in this complaint and its principal headquarters are located in Atlanta, Georgia and employs over 500 employees. The actions occurred at the Salt Lake City base for Delta where Plaintiff's base and managers are located.

6.     Subject Matter Jurisdiction and venue is proper as these matters relates to issues that arise out of federal law under the Americans with Disabilities Act of 1990 and the incidents alleged in this complaint occurred from residents of Salt Lake County and its supervisors and managers and "base" of the company that is located in Salt Lake County, Utah.

## LEGAL ALLEGATIONS

**Diana True**

6a.     Ms. True reported on or about the very first day she first wore the uniform around the end of May or start of June of 2018. She reported shortness of breath and a rash all over her eyes and neck and arms to her supervisor Cindy Atkinson. Ms. True went back to Ms. Atkinson in August of 2018 and asked to wear black and white uniforms at that time. On November 2nd, 2018, Ms. True sent a text to her supervisor Ms. Atkinson with pictures of the patch test she had to do and the blisters on her back.

6ai. Ms. True noted she was struggling with breathing, she was itching. On November 9th, 2018 Ms. True noted that she had become paranoid and was panicking with anxiety attacks with the reactions. On December 27th of 2018, Ms. True asked if she could wear the alternate black and white to Cindy Atkinson, Judy Christensen and Tracy Gallegos who were her supervisor, base manager and Human Resources. They pulled a meeting with her and told her that she could not return to work unless she wore that uniform.

6aii. There was also another meeting with the same individuals and Rob Wissel and said the same thing again. On May 6th, 2019, Ms. True sent a text message to Tracy Gallegos with Delta Human Resources and noted, I haven't got any response so who does he send that to and who do I now need to talk to I've talked to Jude cindy you rob weasel the uniform committee Sedgwick … who do I talk to to get approval for black and white I need to get back to work.On May 2nd, 2019, Ms. True sent a text message to Tracy Gallegos with Delta Human Resources and noted, "This is getting so old and ridiculous and I know you feel the same way as I do I have talked to everyone I've talked to Sedgwick Rock you Cindy Jude I've talked to everyone and nobody can figure out why I have not been able to wear black that's my question why have I not been able to come back to work since December 27th and even Ryan at Sedgwick can't give me an answer."

6aiii. Ms. True also noted on May 9th about Ms. Noren to Ms. Gallegos, "She is so depressed that she cries all day long and I'm really concerned about her depression. She can't get anywhere with anyone and they won't allow her to go back into the black and white I need you to please talk to her supervisor and approve it because she was in the black and white before and I'm really worried about her being so depressed." On July 2nd 2019, Ms. True texted Ms. Gallegos, "I have no money left and no way to get any I've borrowed I've sacrificed I've done without my bills are all due."

6aiii. Ms. True was never approved to return to work until on or about the end of October of 2019. Delta claimed Ms. True had to take a psychological exam without stating why. Delta also claimed Ms. True had to see a pulmonologist from a doctor in Ohio that Delta kept delaying through September of 2019 without explanation. Ms. True had a doctor note that indicated she could work if she was in the alternative black and white uniforms.

**Virginia Mathios**

6b. Ms. Mathios started to notice issues with the uniforms in the Summer of 2018. She suffered

from among other things, hair loss, weight loss, contact dermatitis, swollen lymph nodes, bloody

urine, problems urinating, blurred visions, metallic taste in her mouth, coughing up blood,

bloody noses and shortness of breath and tingling in her hands and feet. Ms. Mathios armpit hurt

and found that she would feel better when she was out of the uniform for a few days. Ms.

Mathios filed a complaint with the uniforms in August of 2018. Ms. Mathios sent an e-mail to

the uniform tea, her supervisor, lands end and SRS reporting the injury on August 7th, 2018. Ms.

Mathios was told from two individuals in a conference call from Atlanta that she needed to put a

liner for her dress. Ms. Mathios had no follow-up and sent pictures to her supervisor in October

of 2018 and heard nothing. Ms. Mathios was given a "non-treated" cotton blouse that put her in

the emergency room in early 2019. Ms. Mathios had to wait for over an hour for a triage

Sedgwick nurse to find a Delta approved facility for her. Ms. Mathio's base director, Jude

Christensen reached out and left a message to her about her the job injury that was relayed to her

by her supervisor Sarah Long.

On February 21st, 2019, Ms. Mathios filed an inflight report with Delta and noted,

> The longer I wear the uniform, the sicker I become. This is now the third time I have
> notified Delta that I have been having allergic reactions to what I am required to wear to
> go to work and do my job. I have sent photographic evidence of rashes, swollen lymph
> nodes and purple- stained items. I received a call in late October (after I reported a
> reaction in August and early October) from some women in Atlanta informing me that
> they would send me uniform liners (which they never did, nor could they tell me the
> chemical makeup of the so-called liners that would be sent).

> I do not use aluminum deodorant or products with BPA or harsh detergents. I was
> non-stop sneezing on this trip, scratching, and had problems urinating. Since the new
> uniform roll out, I have had MULTIPLE bladder infections and my Dr could not figure
> out why and they want to examine my urine. I truly believe the chemicals in the uniform
> are altering my endocrine system and directly affecting me internally. EVEN MY
> underwear are stained purple. I have washed the uniform multiple times and with vinegar
> prior to this trip and others.

During this trip, I had to take antihistamines and increase the dosage daily by adding an allergy medication and nasal spray (as per the pharmacist's orders).. I am demanding to know the products that are being used in our uniforms because I need to visit the dermatologist and figure out why the uniforms are making me so ill. It takes me a full day to recover after wearing the uniform for three days. Working in an environment where temperatures fluctuate, air is recirculated, we sweat and then we shiver, our pores open up and then absorb anything that we put on our body. We sit on a jumpsuit where other crew members sweat and leave residue from their chemical laden uniforms. Please assist in finding a solution to my issue and the greater and larger picture. We need to probe into the long term affects these uniforms are having on our bodies. I have every intention of sending my uniform pieces to be investigated by a professional and reporting to Osha my physical reactions to the uniform pieces Delta has required us to wear because I have voiced multiple times and no solution has been offered. It's downright saddening and negligent. It's downright saddening and negligent. I'm happy to send photographic evidence. Please advise.

Ms. Mathios filed other reports thereafter through May of 2019 of additional

adverse reactions she had to the uniform while on her trips. Over 52 reports were filed during

that time. Ms. Mathios noted that depression doesn't cover what she felt with her physical

symptoms and how Delta treated her. Ms. Mathios was never approved to wear the black and

white alternatives during that time and instead had to continue to wear the purple uniforms.

Around the early part of 2019 Ms. Mathios called to complain about her non-approval of workers

compensation with Sedgwick. Fifteen minutes later, two ladies from Human Resources called

Ms. Mathios on a recorded line. Ms. Mathios sent an e-mail to the Salt Lake Manager group and

asked if she could be approved to wear the black and white on March 20th 2019. She spoke to

her manager Sarah Long in February of 2019 about the uniforms.  In March of that year Ms.

Mathios told Delta to stop sending purple uniforms because they were not working for her. In

April of 2019 Ms. Mathios was still writing to her supervisors, to Robert Wissel of the uniform

about approval for black and white. Ms. Mathios had to send a follow-up letter on July 1st, 2019

for black and white approval and requested an updated on May 26th, 2019. Ms. Mathios also

filed a claim with UOSH in March of 2019 and with OSHA. Ms. Mathios during this process

also contacted Cahterine Graniere, Allison Husband, Carla Roberts, Bill Ittounas, Janne Smith, head of Human Resources, Brian Boudreau. Ms. Mathios had doctor notes that indicated she could work in alternate black and white uniforms.

**Michele Noren**

6c.     Ms. Noren first reported her issues with the uniforms to her supervisor at that time, Jody Griffith or Maria Shirley the manager on duty at that time. Ms. Noren sent pictures of her blistered back to her supervisor on or about June or July of 2018. Ms. Noren was out of the purple uniform in July of 2018. Ms Noren was told she would be pay protected for the trips she missed and had been pulled from to allow her to heal from the blisters. Ms. Noren was also in communication with a special assignment person named Lauren out of Atlanta. Lauren confirmed that Ms. Noren would be pay-protected for the lost trips and pulled her from the schedule halfway through July of 2018 to allow her blisters to heal. Ms Noren was later that month put in the alternate black and white with no health issues in the alternates.

ci. Later on or about February of 2019 Ms. Noren got a message from her supervisor for several days that they wanted all flight attendants in the purple by March 1st, 2019. Ms. Noren was not given an answer from supervisors on what she could wear for her March 1st trip. Ms. Noren had a mandatory meeting on February 29th, 2019 scheduled. Her supervisor either Maria Shirley or Judge Christensen and told her that if she couldn't wear the purple she had to look for other employment and couldn't work in IFS unless she wore the purple uniform that was known to hurt her.

6cii. Ms. Shirley later told her the meeting was not possible due to "legalities" but Ms. Shirley was to still meet with her. Ms. Shirley told Ms. Noren she could wear the black and white in the morning for a few days but it wouldn't be long and Delta would no longer be allowing black and

white. The company later claimed it was just for Ms. Noren. The mandatory meeting was rescheduled and was just for Ms. Noren. The meeting had other management individuals as well which Ms. Noren was not aware of. Ms. Noren said she was mocked and belittled and chastised and told she could not go back to the black and white and that her worker's compensation case was closed.

6ciii. This was without access to Ms. Noren's medical records and Ms. Noren indicating her doctors said differently and contrary to her doctor's notes as well as an IME that Sedgwick claims management conducted that indicated Ms. Noren's symptoms were from the uniforms. Ms. Noren's employment was also threatened. Ms. Noren, wore the purple uniform as a result and led to increasing discomfort, itching, headaches, sore throat, shortness of breath, thinning hair and rashes and blisters on her body. She tried to space out her tripsMs. Noren was a witness and testified for UOSH on the uniform issues in early 2019.

civ. Ms. Noren, on or about March of 2019 was in the process of taking her clothes from the her laundry and had an attack from exposure to the uniform and was unable to breathe. Ms. Noren contacted a Sedgwick nurse and she was told to report to the Emergency Room.

6cv. Thereafter, Ms. Noren never received black and white approval to return to work and could not return to work. Despite she was originally approved for compensation due to her uniform, it was denied with the panic attack she suffered from. Ms. Noren was also not approved for disability and without her ability to return to work without alternative approval, was left essentially financially destitute and unable to provide for herself. Ms. Noren was not finally approved to return to work until on or about November of 2019. Delta would not approve her for black and white from March 2019 to November 2019 and without explanation.

**Cori Berhends**

6d. Ms. Berhends talked to an FSM (Field Serve Manager) at the duty desk and asked her what to do if she thought she was being affected by the uniforms. Ms. Berehends was suffering from difficulty breathing, swollen throat when exposed to the uniform, she suffered from hair loss and her eyes were constantly red and felt dry as well as rashes and kidney pain and tingling in her hands and feet. Ms. Berhends was chastised for not wearing a sweater. Ms. Berhends then spoke to her own field service manager, Jody Griffiths and Janet Olvesky and later talked to Jude Christensen over the department in Salt Lake City on or about April 22nd, 2019. Ms. Ovesky sent an e-mail to Catherine Ganiere on the uniforms indicating if she had heard back from anyone from the uniform team. Ms. Ovesky later took Ms. Behrends off her trips. Ms. Berhends e-mailed Rob Wissel with the uniform team on what black and white she could wear. Ms. Berhend's was always in contact with her claims adjuster with Sedgwick on her workers compensation.

6di. Ms. Berhends had a call from Shannon Thorsgard, the new Salt Lake base manager and Jude Christiansen the base director. Ms. Berhends expressed concern for Delta pulling her from her trip and not providing her workers compensation and they would contact Tracy Garcia in Human Resources. Ms. Berhends had filed a complaint with the FAA and with OSHA and UOSH. Ms. Behrends was not approved to return to work and the company would not offer any compensation for jobs with the same compensation amount under the requirements OSHA specifically made to Delta to individuals that were suffering from the uniform. This was the same for Ms. True and Ms. Noren as well.  Because Ms. Behrends was never approved to return to work and she had to find alternative work. Ms. Behrends specifically put in a request for accommodation on July 29th, 2019 to back to her previous position as gate agent where she

could work in an alternative uniform and not an enclosed space. She was never approved for the accommodation.

6dii. Ms. Berhends indicated she had never been depressed in her life and this situation with how Delta handled her claim made it so she did not want to get out of bed or do anything and feelings of helplessness and hopelessness and anxiety.

**Other Delta employees that were treated differently**

6e. In the Summer of 2018, John Mazurowski III was a male flight attendant who noticed his lymph nodes were swelling. Mr. Mazurowski contacted Delta in October of 2019 about the situation thereafter and was approved for alternative black and white garments without asking for it and without sending in a doctors note. Mr. Mazuroski indicated another male was approved and told they could purchase different pieces of the uniform.

6f. Kathleen Tschishow another flight attendant, started to wear the uniform in December of 2018 and noticed adverse reactions. She put in a request for workers compensation and was immediately approved with payments for her time off of work and approved for black and white.

6g. Stephanie Andrews, another flight attendant was originally approved and compensated for her time off of work and allowed to wear the black and white alternate uniform on or about February of 2019.

**1. Violation of the Americans with Disabilities Act of 1990.**

    **a.  Discrimination, harassment, failure to accomodate, retaliation based on disability. (Plaintiffs incorporates the general allegations in facts 6 above)**

        **i.  Discrimination.**

7.      At the end of May of 2018, Delta issued new "passport" plum uniforms for its flight attendants use as well as other employees that worked in various capacities at the airport. The

uniforms contain harmful and toxic heavy metal and chemical compounds noted further in this complaint. The purple uniforms included, pants, purple sweaters, dresses, aprons, blouses, skirts and leggings among other articles of clothing. The uniforms were produced by the company Lands End.

8.      In June of 2018, Delta flight attendants, including those named in this complaint, started experience issues with the new uniforms. This included rashes, hives, respiratory issues, kidney issues, loss of hair, coughing, runny noses, brain fog, swollen lymph nodes, metallic taste in their mouths, headaches, bloody urine, clogged ears, slurred speech as well as anxiety and depression related to use of the uniforms. Many flight attendants were diagnosed with vocal chord dysfunction as well as asthma. They had to attend speech therapy to help resolve their deep and or horse raspy voice. They also were prescribed inhalers. All individuals suffered from a disability that affected their ability to perform a major life function, namely, their ability to work as flight attendants in the purple uniforms that were issued to them.

9.      Reports were made of individuals that experienced issues to Delta at the onset on when the uniforms were issued. The media caught hold of the issues in June of 2018. Delta claimed it was just a few individuals experiencing problems which were resolved in switching out the aprons. Individuals prior to the issuance of the uniforms that were "testers" also reported health concerns and Delta still did not warn its employees of possible adverse health effects of the uniforms. Delta continued to deny the adverse health affects of the uniforms all the way until on or about November of 2019. Delta never issued a full re-call on behalf of its employees with the uniform. Delta finally indicated on or about November of 2019 that they would change the uniforms.

10.     Numerous individuals complained about the uniforms and the severe health affects and acted as witnesses on behalf of the government investigations including Ms. Noren, Ms. True, Ms. Mathios, Ms. Andrews and Ms. Berhends. In response, Delta would respond with the claim that they did numerous allergy tests on the uniforms and there were no issues with the uniforms and any individual that was suffering from the uniforms was less than 1% of all employees.

11.     There are over 64,000 employees that use the uniforms. A main Facebook page was created to help awareness for all employees that were having health issues with the uniforms as well as a few other Facebook pages. There are were 3,700 members on the main Facebook page at as of June of 2019 time with flight attendants that have suffered from the ill health effects. As of February of 2020, there are over 6,650 members on the Facebook page. The Facebook page was created in December of 2018 by Ms. True to help other flight attendants become aware that their adverse health effects were from the uniform and within 30 days there were 600 members.

12.     If employees experienced health problems with the uniforms, they were to contact Delta and report the injury. All of the Plaintiffs reported the injury and sent in a doctors note from their doctors that indicated that their health problems were related to the purple uniforms with requests that the employees be allowed to wear alternative black and white uniforms they could purchase at a retail outlet store. Ms. Andrews and Ms. Berhends learned the adverse health effects they they suffered from were from the uniforms as a result of the Facebook page in the early part of 2019 and from Ms. True.

13.     Ms. Noren was originally approved for the alternate uniform in the Fall of 2018 as well as received workers compensation benefits. Ms. Noren no longer suffered from the ill-effects while she was in the alternate uniform. Ms. True received benefits and was also initially approved for black and white. Ms. True was bed-ridden on or about October of 2018 for over a

week as a result of exposure to the uniform. After Ms. True recovered from exposure, Delta would not give Ms. True approval to work in the alternate black and white uniform to allow her to return to work.

14.     In the Fall of 2018, Delta started to subject its employees who reported a work-site injury to allergy tests. The test was conducted by Delta with their own samples and requirements on when to report the results which was approximately 48 hours after contact with the skin. Part of the sample included part of the uniform. Ms. True requested Delta not to force her to take the test with concerns it would make her sicker. Her request was denied. She made the request three times. Twice to her base manager and to another supervisor. Ms. True was told she had to do the patch test. Sedgwick claims management an agent of Delta in adjusting its employee's workers compensation claims, said that if Ms. True didn't take the patch test she couldn't go back to work. Ms. True told them she already knew she was allergic to Nickel.

15.     In March of 2019, the Delta uniform team did a reverse and said that all individuals were expected to wear the purple uniform and started to deny individuals their prior-approved workers compensation benefits. Later, Delta started to deny workers compensation claims with the claim that individuals "were already allergic to something and therefore, it could not be the uniform" despite the fact that individuals had tested positive for the uniforms in the skin tests.

16.     All individuals were denied workers compensation with the claim from Delta that it was not the uniform and therefore not a work-site injury. Despite this, employee's doctors would not allow them to return to work in the purple. Employees were stuck in a catch-22. The medical examiners of Delta would not see the individuals personally and only review the medical records. The medical examiners would deny claims even if individuals tested positive for the uniform in the allergy tests. This was disparate treatment toward all Plaintiffs and their injuries

and how they handled their claims compared to others who received more favorable treatment, including approval from black and white and for workers compensation benefits.

17.     Omitted

**New black and white approval**

18.     Delta setup a process for the uniforms for alternate approval where if an suffered from severe health effects from the uniform they would be sent alternative purple uniforms that was discriminatory toward the Plaintiffs. Delta indicated, "You are expected to try-on all available options that would reasonably meet your needs." Employees under Delta policy first had to try the pants suit wool or non-wool. If that didn't work, they had to then try the signature dress. If that didn't work, they then had to try the v-neck dress. If that didn't work they had to try the twin cardigan set. If those didn't work under the policy, then Delta would work with Lands End "to create alternate material options." This included the 100% cotton blouse/shirt. If that didn't work, the company would "add inside lining to garments." If that didn't work, then the individual had to try an "un-treated non performance blouse /shirt." All of the alternate uniforms were still dyed in the passport plum.

19.     All of the alternative options still included the passport plum purple. The purple dye would bleed on individuals' clothing and stain their undergarments as well as other clothes. It would also stain airplane seats. Individuals started to experience the symptoms the worse when they started to sweat, making the dye airborne and enter into the bloodstream and respiratory system. Ms. True experienced a hoarse throat and had trouble speaking immediately when she opened an alternative option. The alternative choices were non-specific or without reason as to the basis on how it would cure the symptoms each flight attendant faced.

20.     At the end of that process there is a hand that says "stop." The policy notes, "Flight
Attendants who have exhausted all options are moved to accomodations process for additional
handling. Once received by accomodations, FAs should provide medical documentation
indicating their needs; the accommodations team will work with FA and Lands' End to
determine if a uniform alternative maybe possible. Alternatively, if no uniform accomodation is
available we will work with FAs to assist with finding a suitable non-uniform positions with
Delta." Any position offered was not the same rate of pay as a flight attendant.

21.     If individuals still suffered severe adverse effects from the uniforms, the company would,
"on a case-by-case determination" allow employees to "temporarily wear approved personal
black and white suit pieces for up to 60 days." This is what is known as "black and white" where
individuals were given a stipend to purchase black-and-white dress uniforms instead of wearing
the issued "passport plum" purple uniforms.

22.     Individuals were issued a 60-day approval form that they had to carry with them. The
form noted, "Please be advised that Delta and Lands' End are currently working to manufacture
a non-wool option that is completely untreated and that you will be required to try that option
when it's made available. The noted indicated, "This exception is for a temporary period of no
more than 60 days from the date of this letter and for those specific items as indicated in this
form. The IFS Uniforms Team reserves the right to review this grant at any time and modify the
end date as appropropriate." The approval was signed by the director and manager of the
company's uniform team.

23.     Since Delta would claim that it was not a work-site injury they claimed they could not
wear black and white, despite a doctor's claim to the alternative. Or, Delta would claim that it
was not the uniform but allow still allow employees to still wear the alternative uniform. There

was no set basis on how an individual was approved for black-and-white and was instead an

arbitrary decision. Also, given the long process to even get approval, many individuals have had

to wait long-periods of time while either missing work or being forced to wear the purple

uniforms as they jump through all of Delta's "hoops" to obtain black and white approval. A pilot

on a flight with a flight attendant saw how bad the flight attendant was suffering from the

uniform and told her to change her clothes. The pilot filed a report to Delta and that person was

immediately approved for black-and-white the following day.

24.     When individuals were unable to return to work despite doctor's notes including Ms.

True, Ms. Mathios, Ms. Noren and Ms. Berhends, they would contact the job accommodation

team. The uniform team did not transfer the claims to the job accommodations team as they

claimed. The accommodation team required a full release of medical information in addition to a

physician's form for job accommodation. This was after employees had already filled out forms

and medical releases for FMLA leave, short-term disability leave and workers compensation.

Delta also would require some individuals to be subject to medical examination experts for these

requests. This is not included in Delta's policy handbook. All it required was a doctor's

certification.

25.     There were also many individuals that Delta would not allow to return to work even

though they were denied workers compensation and black and white approval because Delta was

"concerned about their health" if they returned to work. This was the case of Ms. True and Ms.

Noren. This contradicted Delta's own claims that it was not a work-site injury. Or, individuals

would be approved for black-and-white but Delta would not allow them to return to work and

pull them from the schedule. This happened to Ms. True. Ms. True was originally scheduled to

return to work on or about June of 2019. Later, she received a call that she was pulled from the

schedule. Ms. True maintains that the actions against her was invidious disparate treatment as a result of her suffering from a work-site injury that made it so Ms. True was unable to work. This was without medical documents to show they were so unhealthy to return to work and again and contrary to doctor's notes that they could work if they did not wear the purple uniforms.

26.     Thereafter, Ms. True was subjected to psychological evaluations that Delta wanted Ms. True to have to do in order for her to return to work. They wanted her to do one in Ohio. They also wanted her to see a pulmonologist. The requests for these tests were not made until July of 2019. Delta didn't schedule appointments until September and August and Ms. True was unable to return to work until those tests. After the examinations were conducted, Ms. True was still unable to return to work. Ms. True around this time, showed-up for a test / class she needed to be done as a flight attendant that Delta told her she had to attend. When Ms True showed-up and was there for two hours she was escorted out of the class and was told that she could not be there. There were two classes prior that were cancelled by Delta prior.

27.     Ms. True maintains that the actions against her were discriminatory from suffering from her adverse health effect. Ms. True was treated differently than other individuals that suffered from the same adverse health effects. Other individuals were approved without problem for black and white and were not subject to the same scrutiny as her such as Ms. Tschishow and Ms. Andrews. This is also true for Ms. Behrends and Ms. Mathios and Ms. Noren. The process and procedure was discriminatory, arbitrary and without medical explanation or individual basis as to use of the alternate uniforms.

### ii.     Retaliation based on complaints of disability.

28.     All Plaintiffs also maintains that the actions against them were retaliated for their reports of a severe health effects to their supervisors, of their complaints to their supervisors and to other

personnel related identified in opposition how Delta was handling the situation, including the uniform team, Supervisors and the Vice President that was over Flight Attendant. They also maintain the actions were retaliatory for reporting the issues and or testifying as a witness during an investigation to the division of Utah Occupational and Safety Heath that were made in the early part of 2019 as well as other complaints to the FAA on behalf of other employees that were suffering adverse health reactions. They also maintain that the adverse actions against them were as a result of the creation of the Facebook page to allow individuals collaborate and share stories as to the adverse health affects of the uniforms.

29.     Delta also implemented policies and procedures that were retaliatory and a quid pro quo to keep Delta employees reporting to the public of adverse health effects from the uniforms. The private Facebook page was created and strict rules were provided as Delta had policies that deterred and punished individuals that made social media or public posts that were adverse to the company. All employees, including these employees, were scared of reprisals from the company if they reported these adverse health effects to the media and to their friends and family members publicly on social media.

30.     Finally, on or about November of 2019 Delta did a reversal where they indicated that Delta employees could wear black and white uniforms indefinitely but were expected to wear alternate uniforms when they became available. This was despite the approvals it had made for other flight attendants and direction specifically from OSHA to do so.

31.     Ms. True was not approved for black and white and could not return to work until September of 2019, almost a whole year after she had first taken time off work from the uniform. Ms. Noren was not re-approved for black and white and could return to work until on or about October of 2019. Ms. Mathios was never approved for black and white. The failure to approve

them was in retaliation for their reports to OSHA. It made it so the individuals could not return to work and could not provide for themselves and caused them to suffer from severe emotional trauma with the treatment from Delta and failure to approve them. This is also in light of the fact Ms. True and Ms. Noren were originally approved for black and white. Also, individuals like Ms. Noren were compensated later by delta for the time they were off work later in December of 2019 despite the company's claim it wasn't a work-site injury. Ms. True was never fully compensated for her time of almost a year off work. In December of 2018, Delta  compensated for a few weeks off of work. Ms. Andrews and Ms. Tschishow also received compensation for their time off work during that time.

### iii. Failure to accommodate based on a disability.

32.    These actions incorporated from the other two subsections above were also a failure to accommodate each Plaintiff based on their health conditions with their inability to perform their job without proper accommodations based on a known disease determined by their physicians. Their physicians requested that the individuals wear the black and white uniforms and their physicians indicated they could return to work with such accommodations. Despite this, Plaintiffs were subject to discriminatory practices and policies implemented by Delta through the uniform approval process.

33.    Despite the doctors notes, Delta would still subject employees to additional purple uniforms that still caused ill health effects. The plaintiffs maintain that this was also unlawful harassment based on their health condition. Other employees were not subject to this same process and were approved immediately for black and white. The approval was also only for 60 days. Thereafter, it had to be approved by the company for a renewal. Without the approval, these employees could not return to work such as Ms. True, Ms. Behrends and Ms. Noren. Ms.

Behrends was approved for the black and white and but still raised concerns of still getting sick. Delta called Ms. Behrends on the way to work and said that she could not return to work. This happened on or about May 9th, 2018. Ms. Behrends has been unable to return to work and forced her into a long-term medical leave of absence but her long-term disability was denied.

34.     Also without the approval, the individuals were forced to wear the purple uniform which included Ms. Noren and Ms. Mathios despite the doctors notes that were sent to their employees. The request was reasonable as it only related to a different wear in employee uniform. However, Delta pushbacked only due to branding and marketing of the company which came from Delta's uniform team and the approval process came from the Delta uniform team, not from Human Resources or from supervisors.

> "Having a subgroup of employees wearing black-and-white personal attire and having another group of employees wearing the uniforms just isn't acceptable," Ekrem Dimbiloglu, director of uniforms at Delta, told The Atlanta Journal-Constitution.
> he told the newspaper, noting that thousands wear alternate uniforms. "It's just too many," he said. "We've got to be a unified force."

35.     Branding and marketing is not a reasonable basis to subject employees to additional adverse health effects with additional exposure to harmful substances from the uniform or keep employees from their ability to return to work and provide for themselves and also causes the harassment to be severe and pervasive. Three was no interactive process between each individual and the company on approval. In the cases of all individuals, it was each Plaintiff venting either to their supervisors, Human Resources, the Uniform team or to Sedgwick on why they were not approved to work in black and going through months and months of radio silence on their accommodation request. The time it took to get approved was not reasonable. The delay despite the doctors notes that each individual gave to the doctor was also not reasonable. The denial of

the claim that it was not a work-site injury but not allowing the Plaintiffs to return to work was not reasonable.

36.     Also, in this instant case with the company-wide health effects that employees suffered from, a full recall of the uniforms and use of the old uniforms would have been reasonable in light of the circumstances to ensure that employees, pilots, and paying customers did not suffer from the adverse health effects of the uniform. It would have been reasonable to allow the employees to work in the black and white alternate uniforms with specific guidance from OSHA to Delta to do so or give them alternative jobs with the same amount of pay which Delta never did.

37.     The failure on part of Delta shows their disregard for the health of their employees and the public as a whole and instead with the focus of their public image and how severe and pervasive the harassment was. Delta should have warned its employees of the possible health effects of the uniforms at the onset and from the testers. The failure to do so was also discriminatory to Plaintiffs and their adverse health effects. This was also a failure to accommodate its Delta employees and help them identify possible sources of their adverse health effects. Instead, Delta denied the claims that they were related to the uniforms with communication to its employees and to government investigators for over 16 months. The Plaintiffs as a result suffered adverse health effects and mental distress in how they were stuck in "financial limbo" with their inability to obtain workers compensation and their inability to return to work in the case of Ms. Berhends, Ms. True and Ms. Noren. It forced Ms. Noren and Ms. Mathios to continue to work in the purple.

38.     Ms. Mathios sent in a doctor's note with a request for her to be in the alternate uniform. Ms. Mathios suffered from severe health effects related to the uniform and her symptomology

was one of the worst out of the other Plaintiffs. Delta would not approve Ms. Mathios for

black-and-white uniforms. Given no other option to provide for herself, Ms. Mathios was forced

to continue to wear the purple uniforms. Ms. Mathios would continuously e-mail Delta

supervisors and responsible personnel as to her health condition and request for black and white

approval. This was a specific failure to accommodate Ms. Mathios ans her doctors request for an

alternate uniform and was discriminatory toward Ms. Mathios and the ill health effects she

suffered from the uniform.

39.     In response to Occupational Health complaints, Delta would claim that only 50

employees were approved in the black and white to make it look as if only a handful of

individuals were actually suffering from severe side-effects. Delta did not disclose how many

employees had requested black and white approval that were denied despite specific doctor's

request for them to be in alternate black and white uniforms.

40.     Many employee's personal doctors conducted an "off-gas" test where employees would

be exposed to the uniform for 45 - 60 minutes. The lung capacity was measured before and after

exposure. Employee's lung capacities would diminish 10 - 20% after exposure to the uniform.

Despite these tests, Delta would still claim that it was not a work-site injury. This included Ms.

True, Ms. Andrews and Ms. Berhends.

41.     Females experienced symptoms worse than males and if a male complained of issues

with the uniform, they would not have to go through the same rigorous procedures and approval

as their female counterparts and the failure to accommodate was also discriminatory based on

gender and with disparate treatment toward females and their adverse health effects.

        **OSHA response and alternate work.**

42.     On June 26th, 2019 the Department of Health and Human Services issued a report to the health effects of the uniforms from complaints made by Ms. True and Ms. Mathios. The department concluded, "It is possible that textile chemicals in the uniforms or the physical irritant properties of the uniform fabrics have caused skim symptoms among Delta employees.

43.     The Department recommended the following: "Allow employees to use alternative uniforms on a long-term basis, if symptoms resolve with this alternative." "Allow employees to wear alternatives when their uniforms are being lined." "Continue to encourage employees to report potential work-related health condition to their supervisor." "Healthcare providers may recommend interventions such as the need for removal from exposure of employees with work-related health problems.

44.     If employees are moved to different locations or job duties to work-related health concerns they should retain pay and benefits associated with the original job duties." Delta did not change its pattern with employees when this was issued. Individuals still had to go through their own process for approval despite a doctors note.

45.     Individuals were not offered alternative positions, and if they were, they had to apply for the position at a lower amount of pay, this is what happened to Ms. Behrends as the company claimed that she was too sick to be able to return to work. However, they still denied her short-term disability and long-term disability benefits through their agent Sedgwick. Delta ultimately terminated Ms. Behrends after her long-term disability was denied and marked her absences as excessive absences as the basis for the termination. *(See attached Exhibit C)*

46.     As to alternate position accommodations, the positions are not the same rate of pay of the prior position and Delta only offered assistance. There were no positions that Delta offered.

Individuals were required to apply for any open position that was made available under the same description and pay amount of the description.

47.     In order to access the specific Human Resources inflight policy manual, an individual must request permission to access the resource. Under the policy, Delta offers, "Transitional Duty for takes up to 90 calendar days for employees recuperating from an injury or illness released to return to work with temporary medical restrictions." This was not offered to the flight attendants that suffered from the affects of the uniforms.

48.     Some flight attendants were also subject to additional medical tests to determine whether or not they could return to work while others did not have to go through the same tests.

49.     The harassment was also ongoing harassment since the individuals originally complained of adverse health effects to these uniforms.

        **Delta tests**

50.     In the Fall of 2019, Delta claimed to have conducted its own tests on the uniforms with the claim that there was nothing in the uniforms that would case the adverse health effects its flight attendants suffered. However, many of the "tests" were tests that had already been performed by Lands End. It was not Deltas own individual test and they only relied on those test. Many of Lands End test results that were produced to government occupational exposure agencies also are garments from the old Delta uniforms and not the new passport plum uniforms to claim there was nothing wrong with them.

51.     In its Uniform Testing Comparison Report ("Testing Report"), Delta pledged: "[S]afety is our top priority and since we began redesigning the uniform three years ago, our top focus has been ensuring that every employee can safely wear these new garments." Delta further stated that it and "Lands' End have taken detailed steps to ensure that the garments undergo significant

testing that meets or exceeds appropriate industry standards…". The Testing Report then sets forth the applicable standards, claiming that the garments meet these standards.

**Independant garment tests**

52.     The "extractable heavy metal limits established by the Report expressed in mg/kg include:

Chromium - 2.0, Mercury - .02, and Antimony - 30.0. The "allowed limit per garment" established for Formaldehyde expressed in the ppm is 75. The Testing Report also claims to have screened for "Volatile Organic Compounds." No reference is made to which Compounds were screened, but the Report established limits at 10 mg/kg. For such Compounds, the Report also claimed no detectable amounts.

53.     Counsel for Plaintiffs have began testing numerous different Uniforms at three different independent labs. Also, the Association of Flight Attendants also conducted independent tests on garments submitted by Delta employees on or about November of 2019. Tests have revealed harmful, toxic levels that are literally off the charts, as high as 130 times established limits. To date, we have found different garments with the following staggeringly high levels expressed in mg/kg (Each number representing a separate garment):

54.     Antimony - 51.8, 52.3, 53.1, 61.5, 64.4, 67, 67, 70, 72.3, 74.5, 74.6, 76.4, 77, 77.3, 78.5, 79.3, 79.5, 83.1, 83.6, 94, 103, and 147.

55.     Chromium -12.3, 24, 34.6, 35.6, 36, 52.4, 54.3, 59.7, 62.8, 68.8, 69, 75.2, 75.7, 77.3, 78.7, 80,

56.     84.2, 86.8, 89.3, 89.8, 92, 98.3, 101, 127, 130, 231, and 263.

57.     Mercury - .0247, .059, and .082.

58.     Bromine - 54, 90, 112, 160, 217, and 433.

59.     Fluorine - 61, 64, 79, 89, 297, 725, 807, 862, 865, 886, and 1,068

60.     Testing each garments for Formaldehyde also revealed staggeringly high levels using

Released

61.     (Vapor Absorption) Methods after 3 and 20 hours: 3 hours

62.     75, 107, 148, 281, and 764 20 hours 115 and 254.

63.     According to the Center for Disease Control, these metals and chemicals include the

following known adverse health consequences:

64.     (a) Chromium: It is harmful to the skin, eyes, blood, and respiratory system. (b)

Antimony: It is harmful to the eyes, skin and cause hair loss. It is used to make

flame-proofing materials.

65.     (c) Mercury: High mercury vapor concentrations can quickly cause severe lung

damage. At low vapor concentrations over a long time, neurological disturbances, memory

problems, skin rash, and kidney abnormalities may occur. Mercury can pass from a mother to her

baby through the placenta during pregnancy and through breast milk after birth.

66.     (d) Formaldehyde: Exposure to formaldehyde can irritate the skin, throat, lungs, and

eyes. Repeated exposure to formaldehyde can lead to cancer.

67.     (e) Fluorine: Exposure to Fluorine can irritate the eyes and harm the

kidneys, teeth, bones, nerves and muscles. It is used as a stain repellant.

68.

69.     (f) Bromine: Used as fire retardant. Bromine works by directly irritating the skin,

mucous membranes, and tissues.

kidneys, teeth, bones, nerves and muscles. It is used as a stain repellant.

70.     Finally, despite Delta's claim and maintained the issue was not the uniform Delta gave the following statement to its employees, "At Delta, our people are the foundation for our success. It starts with our commitment to listen and is fueled by a spirit of continuous improvement. Our uniform program was built on these principles and always will be. During the last few months, we've taken many steps to alleviate some of the frustration and challenges some of you have experienced with the uniforms. We've created alternative garments, hired experts, tested for over 400 chemicals, incorporating OEKO-TEX's published chemical list and testing limits, given you the option of wearing black and white, and provided access to the best doctors in the country."

71.     "Despite these efforts, we have not been able to resolve this situation for everyone, which has been our top priority all along. That's why we are announcing a completely new uniform program for flight attendants and ACS above-wing employees, along with updates to our existing uniform in the interim. We will work together to get you in these new uniforms as soon as possible, hopefully in late 2021, depending on the feedback and guidance we receive from you."

72.     As a result, Delta, failed to reasonably accommodate its employees for its failure to properly conduct its own independent tests in a timely fashion and in a reasonable and prudent and proper manner. Delta failed to conduct test results before it denied liability and causation toward Plaintiffs and before it denied liability toward government agencies and to the media. Without this knowledge and without proper, neutral testing, Delta could not claim that the issue was not the uniforms. The admission here from Delta indicates they did not reasonably accommodate its employees and that they knew the severe health issues individuals suffered from were as a result of the uniform.

73.     Each individual suffered from additional adverse health effects due to additional unnecessary exposure to the uniform and emotional distress as it related to dealing with the health effects from the uniform, as well as with Delta and the financial impact it caused them. Each individual had to deal with the emotional distress and adverse health effects in the past and will have to deal with its future impact as well. Each individual suffered from loss of enjoyment of life as it dealt with dealing with Delta and their health problems. Each individual had to take time off work and suffered from loss wages and benefits. Each individual has incurred health costs and expenses. Each individual has also suffered consequential effects such as out of pocket expenses for health care costs, borrowed money from relatives, lost savings, incurred credit card interest, credit scores as well as lost Delta benefits including vacation leave, skybucks, profit sharing. Each individual also seeks reimbursement of attorney fees and costs as a result of the violations described related to violations of the Americans with Disabilities Act.

74.     Plaintiffs also maintain that the actions here were intentional as described in the complaint with ulterior motives to down-play the effects of the uniforms, to promote their brand over employment safety.

### iv. Harassment

75.     Plaintiffs also maintain that the actions and facts described in each subsection of the discrimination claims was severe and pervasive treatment toward Plaintiffs for suffering from adverse health reactions from the uniforms and for reporting the adverse health reactions in the creation of the Facebook group, the complaints to OSHA and the complaints to Human Resources, the uniform team, supervisors and other managers. It was severe and pervasive to keep the individuals out of work for so long without their ability to provide for themselves despite their claim it wasn't a job injury. It was severe and pervasive to force individuals like

Ms. Mathios and Ms. Noren to continue to work in the purple uniforms despite Ms. Mathios continues and numerous reports and Ms. Noren's indication to Delta and her supervisors on how it affected them. Instead, Ms. Noren was belittled, ridiculed and mocked about her claims to adverse reaction to the uniform in a meeting with supervisors and other personnel and instead forced her to continue to wear the uniform and thereafter did not allow her to return to work without their unjustified approval. Ms. True was also forced not to return to work for over a year. Ms. True was subjected to unjustified claims Ms. True needed a mental health exam over 8 months without ever indicating she needed one. This also included the claim over 8 months out of thin air that she needed to see a pulmonologist. All individuals suffered from severe emotional distress including depression, suicidal thoughts, feelings of hopelessness and helplessness, anxiety, general fear, anger, crying with how Delta treated their complaints of work-site injuries.

## II. Intentional Infliction of Emotional Distress

76.     Delta through its employees and agents acting within their scope of employment with their duties at least in part to confer a benefit on Delta or acting with actual or apparent authority described in the discrimination section of this complaint and paragraph 6 of this complaint intended to inflict emotional distress on each Plaintiff named in this action. Delta through each Plaintiff's supervisors, uniform team and Human Resources was aware that each Plaintiff suffered or complained of severe side-effects, including respiratory problems from use of the passport plum uniforms. Each Plaintiff complained to Delta of the side-effects, filed for workers compensation claims and short-term and long-term disability claims and Family Medical Leave claims and requested accommodations to use of the black and whtie uniform instead of the purple plum uniform.

77.     Delta was aware of its employees as a whole that were suffering from adverse health effects from the uniforms prior to when the uniforms were issued with its testers and when the uniforms were initially issued. Despite this, Delta failed to inform its employees of possible side-effects they could be suffering from its uniforms and reasonable options on how to avoid the side effects for over 16 months.

78.     Delta had knowledge of the health effects complaints of each Plaintiff, and each flight attendant's inability to work without black and white approval or to suffer adverse health effects with working without approval. All Plaintiffs complained through numerous e-mails to Human Resources, the uniform team and other personnel of their treatment and requests for accommodation and return to work or to work without the purple.

79.     Plaintiffs complained through a demand letter to Delta corporate through retained counsel and to thereafter locally retained counsel with requests as to why individuals could not return to work and or not approved for black and white. No responses were made and no timely accomodations were made. Given the knowledge of the requests, the denials and delays and without any justifiable explanation, Delta intended to cause emotional distress on each Plaintiff. This is also as it relates to the retaliation claims and the complaints that these individuals made toward Delta and the different treatment that other employees received from Delta that were more favorable.

80.     Each Plaintiff either had to suffer wearing the purple, in the case of Ms. Noren and Ms. Mathios without approval. Each Plaintiff had to suffer wearing the purple without knowledge of its severe health effects for months or almost a year. Those that could not return to work absent approval suffered severe emotional distress in their inability to return to work and provide for themselves and for the frustration toward Delta and their inability to work with and properly and

timely accommodate each of them. Delta through its supervisors with Ms. Mathios, including Sarah Long and Judy Christensen knew she was suffering adverse effects from the uniforms. This also includes all of the 42 complaints she filed with Delta. Despite this, Delta, its supervisors, the uniform team and Human Resources would not approve Ms. Mathios of black and white, knowing the adverse health reactions she was suffering and knowing that it was virtually certain she would continue to suffer adverse health reactions.

81.     Ms. Noren through the meeting she had with supervisors told them of the adverse health reactions she would have with the purple uniform, the rashes and itching and trouble breathing. Her supervisors knew it was virtually certain that she would again suffer from the same adverse health effects if she continued to wear the uniform but still forced her wear the purple uniform that caused Ms. Noren to have a breathing attack and subjected her to the Emergency Room. the company was also aware of the adverse health effects Ms. Noren was suffering without approval for black and white so she could return to work through Ms. True and through Ms. Noren herself.

82.     The company was aware the distress Ms. True suffered from with her inability to return to work for almost a year with the constant communication she had with supervisors, Human Resources, the Uniform team and other management personnel. Despite this the company without justification would not approve her to return to black and white until 8 months. Ms. True was also forced to jump through different hoops than other individuals without justification with the intent to inflict emotional distress on Ms. True. The purpose and intent not to approve Ms. True as well as the others was due to their complaints they made to OSHA and their management of the Facebook page to allow others to be aware of the issues. Delta saw these individuals as "problem children." It raised concerns of employees unionizing and Delta specifically sent out a social media message to deter a union indicating that individuals would be better off saving their

money for a video game console. As a result, it was Delta's intent not to allow Ms. Noren, Ms. Berehends and Ms. True to return to work with the legal issues they were raising toward Delta. Delta also knew it would be virtually certain that these individuals would suffer from emotional distress with their inability to return to work and provide for themselves.

83.     All Plaintiffs also suffered from anxiety, stress, depression, frustration, feelings of hopelessness and helplessness, crying, anger and suicidal thoughts. Each individual has also suffered from loss of enjoyment of life in day-to-day activities and other leisure activities. They have also suffered from consequential damages including credit scores, out of pocket expenses for medical, lost savings, borrowing money from friends and family, interest on unpaid medical bills.

84.     The actions were outside the bounds of decency given the claims as to discrimination and failure to accomodate in the disability section. This is given Delta's knowledge of adverse health effects of its own employees that Plaintiffs reported as well as reports from other employees and its failure to help them properly resolve the issues which only they had the power to do so. This is also in light of the length of time Delta went through denying these claims and not allowing these individuals to return to work without justification. This is also in light of the adverse health effects that customers and pilots also may have suffered from exposure to these uniforms.

85.     Plaintiffs also seek punitive measures against Delta given their wilful and wanton disregard for the health, life and safety of its employees including these Plaintiffs to deter Delta from acting in the same in the future and to punish Delta for their intentional actions described in this complaint.

**III. Assault and Battery (Claims for Ms. True, Mathios and Noren)**

86.     As indicated in the intentional infliction of emotional distress claim, Delta had

knowledge of the ill adverse health effects of the uniforms prior to their issuance. Delta also had

knowledge of the complaints of its employees after its issuance to them and their reports of

adverse health effects, including doctor notes as noted in paragraph 6 of this complaint

incorporated here. Delta had knowledge of the ill effects that each individual employee in this

complaint was suffering from as a result of the uniform.

87.     Given this knowledge, Delta through its agents in the failure to approve alternative

garments, forced Ms. Noren and Ms. Mathios to work in the uniforms after notice to the

company of the adverse health effects this includes the complaints to supervisors and the

approval for workers compensation of Ms. Noren in 2018 and black and white. The claim Ms.

Noren had to wear purple thereafter with the threats of her job knew it was virtually certain Ms.

Noren would again suffer from the adverse health effects of the uniforms. It placed Ms. Noren in

apprehension of fear of wearing the uniform and caused her to actually suffer again adverse

health effects from the uniform that ultimately caused her to go to the emergency room. Delta

also failed to provide notice of possible adverse health effects to Ms. Noren and Ms. Mathios.

This shows that Delta intentionally or in reckless disregard wanted to cause harm to Plaintiffs

with use of the uniform in the name to preserve the company image and brand and to deny

liability of the uniform health effects to ensure that the public at-large did not become aware of

the issues.

88.     Delta was also aware the adverse health effects that were affecting Ms. Mathios with her

reports to her supervisors, the uniform team and Human Resources as well as the over 42 flight

reports Ms. Mathios filed as how the uniforms were affecting her. As a result, Delta knew it was

virtually certain Ms. Mathios would continue to suffer from adverse health effects while she

continued to wear the purple uniform and placed her in immediate apprehension of harm and actual harm for wearing the purple uniform.

89.     Ms. True also pleaded with the company through supervisors not to make her do a purple patch test with the uniform and told them how exposure to the uniform affected her. Delta knew it was virtually certain Ms. True would suffer from additional adverse effects with the patch test and forced her to take it despite her specific requests not to do so and put her in apprehension of immediate harm and actual harm when she was exposed through the patch-tests of the uniforms.

90.     Delta sacrificed the health of its employees to control its Public Relations and to curtail negative nation-wide publicity. Each Plaintiff has now paid the price with severe health effects. Each Plaintiff had to suffer the pain from the contact and exposure to the uniform and the after effects. Each individual also, even though approved for alternate garments, also suffer and suffered from proximity to other individuals that wore the purple uniform.

91.     It is unknown at this time how it will affect these clients in the long-term. Each Plaintiff has now suffered emotional trauma as noted in the intentional infliction of emotional distress claim and incorporated here. Each Plaintiff suffered from lost wages and benefits past and future. Each Plaintiff suffered from medical expenses and costs as well as consequential losses from their inability to work or return to work and from the trauma related to exposure from the uniform.

92.     Plaintiffs also seek punitive measures against Delta given their wilful and wanton disregard for the health, life and safety of its employees including these Plaintiffs to deter Delta from acting in the same in the future and to punish Delta for their intentional actions described in this complaint.

**IV. Wrongful termination based on public policy. (Ms. Behrends)**

93.     Ms. Berhends and Ms. True were wrongfully terminated based on public policy. Ms. Berhends and Ms. True reported and participated in an investigation with OSHA and UOSH as to the adverse health effects of the uniforms. The two individuals were also the moderators for the Facebook page they made for flight attendants to allow flight attendants to corroborate their health issues they were experiencing.

94.     OSHA gave specific direction to Delta to allow individuals to wear alternate uniforms. OSHA gave specific direction to Delta to allow individuals to work an alternative position with the same amount of pay. Delta did not allow or offer that to Ms. Berhends and Ms. True. This made it so Ms. Berhends was not allowed to return to her position under her job description and was ultimately constructively discharged for suffering from ill effects from the uniforms.

95.     This is in violation of public policy in the failure to accommodate Ms. Berhends with the direction from OSHA. The failure to authorize her to return to work was also in violation of public policy as it related to Ms. Berhends complaint with OSHA and UOSH and being part of the Facebook page. This was also in violation of public policy as instead of focusing on the health of its employees, of its pilots and the customers that came in contact with them and doing a full re-call of the uniforms, Delta continued to deny the existence of problems with the uniforms. They also miscommunicated with investigators what garments were actually tested and how many individuals had actually made complaints of the uniforms. Delta never tested uniforms from its own employees. This made the conditions to where Ms. Berhends had no choice but to seek other employment as she was not allowed to return as a flight attendant. The conditions Delta placed Ms. Behrends in emotionally and financially with her inability to return to work also made conditions so intolerable she was forced to leave Delta.

96.     Ms. Berhends suffered from emotional distress, lost wages and benefits, consequential damages past and future as a result of how she was treated.

97.     **Wherefore, Plaintiffs seeks the following relief in this matter:**

1. For a jury trial to be set to determine liability on each claim alleged.

2. For damages pleaded in these causes based upon a finding of liability for each claim.

3  For all other relief pleaded in this complaint as well as any other relief the court may deem necessary.

Submitted this 20th day of October, 2020

/s/ Brian K. Jackson        #15296
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Plaintiffs